**SECOND DIVISION**
**BARNES, P. J.,**
**BOGGS and RICKMAN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**November 17, 2016**

# In the Court of Appeals of Georgia

A16A1188. MIDVILLE RIVER TRACT, LLC v. CENTRAL OF
GEORGIA RAILROAD COMPANY et al.

RICKMAN, Judge.

In November 2010, a train operated by Central of Georgia Railroad Company and partly owned by Norfolk Southern Railway Company (collectively, "the Railroads"), derailed near Midville, Georgia causing a chemical spill onto real property owned by Midville River Tract, LLC ("Midville"). Midville sued the Railroads for damages, alleging that the derailment was caused by an internal flaw in the track rail that necessarily resulted from negligence during the welding process of its construction. The trial court granted summary judgment to the Railroads after concluding that Midville's claims were preempted by federal law and, alternatively, that its measure of damages was speculative and failed as a matter of law. We agree

with the trial court that Midville's claims are preempted by federal law and, accordingly, we affirm.

This Court reviews de novo the trial court's decision to grant a motion for summary judgment. See *Howell v. Normal Life of Ga., Inc.*, 337 Ga. App. 774, 775 (788 SE2d 840) (2016). We construe the evidence in the light most favorable to Midville, and we affirm if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." OCGA § 9-11-56 (c); see id.

So construed, the facts are as follows. On November 21, 2010, a train derailed in the coastal plains of Georgia outside of the Town of Midville. Central of Georgia operated the train and owned the railroad track where the derailment occurred; Norfolk Southern owned the locomotive at the front of the train.

As a result of the derailment, a tanker railcar containing methyl ethyl ketone ("MEK")[1] ruptured and released most of its contents into the soil of Midville's property. A substantial portion of the released MEK was consumed in a fire that occurred following the derailment; the remaining MEK, however, flowed from the north side of the track to the south side of the track and entered the soil. Although the

---

[1] MEK is a highly flammable, colorless liquid solvent.

Railroads cite to record evidence that the surface area of the MEK spill affected less than two acres of Midville's 989-acre property, Midville questions the accuracy of that calculation as it pertains to the affected soil.

An investigation revealed that the derailment was caused by a fracturing of the rail. The rail was a "continuous welded rail"—i.e., a rail consisting of abutting lengths of railroad track connected by welds—and was constructed using a method called "thermite welding." The investigation determined that the fracture resulted from a "dendrite inclusion," or a void in the thermite weld, which formed during the final stages of the welding process as the medal solidified.

It is undisputed that the void in the weld was microscopic and was undetectable using the technology available at the time of the derailment. It is further undisputed that the Railroads were in compliance with federal regulations regarding the frequency of inspections of the rail and that, in addition to visual inspections, the area of the derailment had been inspected by a track geometry car less than one month before the derailment, and had been inspected by a "Sperry car" using ultrasonic technology less than three months before the derailment. Finally, it is undisputed that the train was not speeding at the time it derailed.

Midville filed suit against the Railroads, asserting tort claims for damage to property, trespass, and nuisance, and alternatively arguing that it was entitled to damages under the doctrine of res ipsa loquitur. Its claims are premised upon an allegation of negligence by the Railroads. Although the parties' experts disagree on this point, Midville's expert contends that the void in the metal would not have formed in the absence of negligence during the welding process. Specifically, the expert opined that the dendrite inclusion formed because the welder, whose identity remains unknown,[2] failed to observe proper welding procedures by removing the molds used to make the welds too quickly, and/or performing the welding "in temperature conditions that would compromise the integrity of the thermite weld." Thus, Midville's complaint alleges that the fractured weld "was installed incorrectly and imperfectly, in violation of Federal Railway Administration Regulations and the internal policies and plans of [the Railroads]." Midville maintains that its real property was intended to be used as a federal wetlands mitigation bank, and that it has suffered a "complete and total loss" of the 989-acre tract, despite the Railroads'

---

[2] Generally, a welder constructing any portion of rail stamps identifying information, including when the weld was made and by whom, on one of either end of a field weld. In this case, the opposite side of the defective weld that contains the identifying information was never located.

remediation of the property. It seeks to recover as damages the full value of the property.

The Railroads moved for summary judgment, contending that Midville's tort claims were preempted by federal law and challenging the evidence supporting Midville's claim of damages. The trial court granted summary judgment to the Railroads, reasoning both that Midville's claims were preempted by federal law and that its measure of damages was too speculative such that it failed as a matter of law. This appeal follows.

1. "Railroads are among the most heavily regulated American industries." *Zimmerman v. Norfolk Southern Corp.*, 706 F3d 170, 174 (3d Cir. 2013). Congress passed the Federal Railroad Safety Act ("FRSA") in order to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 USC § 20101. The FRSA gave the Secretary of Transportation authority to "prescribe regulations and issue orders for every area of railroad safety" in order to carry out this purpose. 49 USC § 20103 (a). The FRSA preempts any state or local law, regulation, or order that is "an additional or more stringent law, regulation, or order related to railroad safety or security . . ." 49 USC § 20106 (a) (2).

In 2007, Congress passed an amendment to the preemption provision in order provide "[c]larification regarding State law causes of action." 49 USC § 20106 (b). The amendment provides, in part, that federal law does not preempt state law causes of action seeking to recover for damage to property by alleging that a party "(A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters)" or "(B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by [the Secretary of Transportation]." 49 USC § 20106 (b) (1).

Midville contends that federal law required the Railroads to prescribe internal standards, plans, and procedures governing the safe installation of continuous welded rail, and that the Railroads failed to comply with their own internal standard–Standard 425–governing thermite welding. Therefore, Midville argues, its claims fall within 49 USC § 20106 (b) (1) (B) and are not preempted.[3]

---

[3] In its brief, Midville somewhat conflates 49 USC § 20106 (b) (1) (A) and (B), arguing that the Railroads failed to meet their federal duty under 49 USC § 20106 (b) (1) (A) by allegedly violating their own internal standard under 49 USC § 20106 (b) (1) (B). Regardless, the crux of Midville's argument is that its claims are not preempted because the Railroads violated their own internal Standard 425 governing thermite welding.

The flaw in this reasoning, as argued by the Railroads and held by the trial court, is that Midville's claims are preempted unless Standard 425 was "created pursuant to a regulation or order issued by [the Secretary of Transportation]," 49 USC § 20106 (b) (1) (B), and the record fails to establish that it was. Rather, pursuant to 49 CFR § 213.118, the Railroads are required to have in effect and comply with a plan regarding the installation of continuous welded rail, 49 CFR § 213.118 (a), and the plan must be filed by the Railroads and approved by the Federal Railroad Administration ("FRA"). 49 CFR § 213.118 (b). The required minimum elements of the federally mandated plan are set forth in 49 CFR § 213.119 (2010).

Nowhere does 49 CFR § 213.119 direct the adoption of an internal procedure governing thermite welding. Indeed, the Railroads' plan governing continuous welded rail, as submitted to and approved by the FRA in accordance with 49 CFR §§ 213.118 and 213.119, is contained in the record and does not include Standard 425. And Midville makes no allegation that the Railroads violated any standard actually contained within plan that was submitted to and approved by the FRA pursuant to 49 CFR §§ 213.118 and 213.119.

We decline Midville's invitation to hold that Standard 425 was adopted pursuant to a directive by the Secretary of Transportation merely because it is

7

"reflective of [the Railroads] legal duty . . . to enact plans and procedures for the safe installation and maintenance of continuous welded rail" and/or because the plan as submitted to and approved by FRA contained a "special reference[ ]" to Standard 425 among numerous other references that were neither expressly incorporated into nor attached to the plan. Compare 49 CFR § 218.109 (a) (1) ("Each railroad shall adopt and comply with an operating rule which complies with the requirements of this section. . ."); 49 CFR § 232.103 (n) (4) (2010) ("A railroad shall adopt and comply with a process or procedures to verify that the applied hand brakes will sufficiently hold an unattended locomotive . . ."). To do so would expand the requirements of 49 CFR §§ 213.118 and 213.119 and directly contradict federal law governing preemption. See 49 USC § 20106 (b) (1).

In sum, nothing in the federal regulations or in the appellate record support a finding that Standard 425 was created pursuant to an order issued by the Secretary of Transportation. Compare 49 CFR § 213.119 (2010) ("The plan [containing written procedures which address the installation, adjustment, maintenance, and inspection of continuous welded rail] shall contain the following elements . . ."). We therefore conclude that Standard 425 is an internal standard exceeding the minimum plan requirements set forth in 49 CFR 213.119 (2010), and any cause of action by Midville

premised upon an allegation that it was violated is preempted by federal law. See 49 USC § 20106 (a) (2); see also *Driesen v. Iowa, Chicago & Eastern R.R. Corp.*, 777 FSupp2d 1143, 1158 (III) (B) (5) (N.D. Iowa, 2011) (holding that appellant's claims based upon railroad's alleged violation of internal rules were preempted because appellant failed to cite to any federal regulation mandating the internal rules); *Van Buren v. Burlington Northern Santa Fe Ry. Co.*, 544 FSupp2d 867, 879 (D. Neb., 2008) (same). Compare *Skrovig v. BNSF Ry. Co.*, 855 FSupp2d 933, 944 (1) (D.S.D., 2012) (rejecting railroad's denial that the internal operating rules that were allegedly violated were developed pursuant to a federal regulation when the railroad otherwise failed to produce any other evidence of the federally mandated internal rules).

2. Our holding in Division 1 renders it unnecessary for us to address Midville's remaining enumerated of error regarding the trial court's holding related to evidence of its property damages.

*Judgment affirmed. Barnes, P. J., and Boggs, J., concur.*