**FIFTH DIVISION**
**BRANCH, J.,**
**RICKMAN and REESE, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 23, 2017**

# In the Court of Appeals of Georgia

A17A0319. FOX v. NORFOLK SOUTHERN CORPORATION et al.

BRANCH, Judge.

This appeal arises out of a right-of-way owned by Norfolk Southern Railroad Co. and bisecting a parcel of land owned by C. Randall Fox. After the railroad constructed a passing side track running parallel to the existing track situated in the right-of-way, Fox sued Norfolk Southern Corporation and Norfolk Southern Railroad Co.[1] in Gordon County Superior Court, asserting claims for inverse condemnation and trespass. Fox now appeals from the trial court's order granting summary judgment to Norfolk Southern, as well as the order denying Fox's motion for reconsideration. Fox contends that the trial court erred in finding both that the

---

[1] The appellees are referred to collectively herein, together with Norfolk Southern Railroad's predecessors in interest, as "Norfolk Southern" or "the Railroad."

Railroad constructed the passing track within its right-of-way, and that Fox has not acquired any part of that right-of-way by adverse possession. Additionally, Fox asserts that the trial court erroneously found that his claim for inverse condemnation of his property situated to the east of the railroad tracks is preempted by federal law. For reasons explained more fully below, we find no error in the trial court's grant of summary judgment to Norfolk Southern on Fox's inverse condemnation and trespass claims related to the Railroad's right-of-way, and we therefore affirm the grant of summary judgment on those claims. We further find, however, that the trial court erred in granting Norfolk Southern summary judgment on Fox's claim for inverse condemnation of his property to the east of the railroad tracks. We therefore reverse that part of the trial court's order which found that this claim was preempted by federal law.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). "In reviewing a grant or denial of summary judgment, we owe no deference to the trial court's ruling and we review de novo both the evidence and the trial court's legal conclusions." *GAPIII, Inc. v. Seal Indus.*, 338 Ga. App. 101, 102 (789 SE2d 321) (2016). Moreover, we construe the evidence and all inferences and conclusions

2

arising therefrom most favorably toward the party opposing the motion. *SKC, Inc. v. EMAG Solutions*, 326 Ga. App. 798, 798 (755 SE2d 298) (2014).

Here, the relevant facts are largely undisputed,[2] and they show that Fox owns a piece of real property in Gordon County that is bisected by an active railroad track. The property, which totals approximately 160 acres, originally consisted of three separate tracts of land, which the parties have referred to as Tracts 1, 2, and 3. The western boundary of Tract 1 fronts on Old Dalton Road, and Fox uses Tract 1 to access Tracts 2 and 3. Tract 1 is bounded on the east by the Railroad's right-of-way, and Tracts 2 and 3 are bounded on the west by that right-of-way.[3] To access Tracts 2 and 3, therefore, Fox must travel east over the tracks situated in the right-of-way. Fox does this by means of a private railroad crossing that appears to have been in existence as long as the tracks themselves.

In 1868, Norfolk Southern's predecessor in interest obtained title to the right-of-way in fee simple, and the deed conveying the property describes it as

---

[2] Where there is any conflict in the evidence, we have construed that evidence in favor of Fox as the non-movant. See *SKC, Inc.*, 326 Ga. App. at 798.

[3] Tract 2 is also bounded on the west by Tract 3, on the east by the Oostanaula River, and on the north and south by private property not owned by Fox. Tract 3 is bounded on the east and north by Tract 2 and on the south and east by private property not owned by Fox.

a strip of land along such line as may be adopted by the [Railroad] of sufficient width through said lot of land . . . [to] build said rail road as well as all sidetracks and turnouts and necessary and sufficient for all purposes of keeping up and repairing the same not to exceed fifty feet from the center of the main line to each side making said strip not to exceed one hundred feet – full width together with all the rights and appurtenances to said strip of land. . . .

The deed further provides that the Railroad "shall construct and keep in repair all necessary stock gaps and road crossings" and that "the landowner may cultivate the soil as close to the track as the ditches will permit." The deed was recorded in April of 1871. The railroad tracks were constructed in approximately 1870, and have been in use since that time.

In 1915, the Railroad conducted a survey of all its real property to create a valuation map for filing with the Interstate Commerce Commission ("ICC").[4] Fox's land is depicted on the 1916 valuation map, and the map shows the location of the

---

[4] In 1913, Congress amended the Interstate Commerce Act to include the Railroad Valuation Act, whose purpose was to provide the federal government a basis for assessing taxes against the nation's railroads. See *Dana R. Hodges Trust v. United States*, 2011 U. S. Claims LEXIS 2062 at *34 (B) (1) (Ct. Fed. Claims 2011); *Southern R. Co. v. United States*, 585 F2d 466 (Ct. Fed. Claims 1978). The law required railroads to file maps of all their real property with the ICC, and "[f]or Southern Railway Company [Norfolk Southern's predecessor in interest], the ICC evaluation date was June 30, 1916." *Southern R.*, 585 F2d at 468.

right-of-way granted in the 1868 deed. The map further shows that the right-of-way is 100 feet wide, 50 feet on each side of the track, measured from the track's centerline. The Railroad filed a second valuation map in 1927, and that valuation map also reflects that the Railroad has a 100-foot right-of-way bisecting what is now Fox's land.

Fox purchased the property in question in the fall of 2001, acquiring Tracts 1 and 3 from Total Investment Properties and acquiring Tract 2 from Edmond Holland and Ted Fuller.[5] Neither of the deeds transferring title to Fox contain metes and bounds descriptions, but the deed conveying title to Tracts 1 and 3 incorporates by reference a plat of survey dated September 9, 1991, and recorded at Plat Book 23, page 35. The deed conveying title to Tract 2 incorporates by reference a September 2001 survey done for Fox in conjunction with his purchase of all three tracts, and recorded at Plat Book 40, page 7. The September 2001 survey depicts all three tracts, and both the 1991 and the 2001 surveys show that the Railroad owns a 100-foot right-of-way that lies between Tract 1 and the remaining property.

---

[5] According to Fox, his purchase of Tract 2 was contingent on his ability to purchase Tract 1, because without Tract 1 he could not access the remainder of the property.

The train tracks bisecting Fox's property are part of Norfolk Southern's "H" line. In approximately 2007, Norfolk Southern began to plan the construction of a new passing side track,[6] to run parallel to the existing tracks on the H line, including those tracks bisecting Fox's property. As part of that process, the Railroad's engineering department decided that the optimal design for the new passing track would require the Railroad to acquire an additional 40 feet of width adjacent to its existing right-of-way. Norfolk Southern thereafter began approaching property owners, including Fox, about purchasing from each of them the additional right-of-way requested by the engineering department. In May 2007, representatives of Norfolk Southern met with Fox, provided him with a plat showing the additional property the Railroad was seeking to purchase, and offered to buy the land for $25,000. According to Fox, he told the Railroad he would give them the property if they would provide him with a written guarantee that no train would block his private crossing for more than 30 minutes at a time. The Railroad responded that it could not provide such a written guarantee, and Fox therefore declined sell them any additional

---

[6] A passing side track allows the train on the main track to pull over so that another train (usually one traveling in the opposite direction) can pass on the main track. Thus, according to one Railroad representative, a passing track differs from a traditional side track in that its usual purpose is not to store trains for a significant length of time.

6

right-of-way. Engineers at the Railroad then reconfigured the plans for the passing track so that the portion bisecting Fox's property would fit entirely within the existing right-of-way.

The new passing track became operational in January 2008, and according to Fox, trains routinely sit on the new track and block the private railroad crossing that serves his property for up to 24 hours at a time. The blockages are so frequent that Fox, who had previously grazed cattle on the land, can no longer use the property for that purpose. In September 2010, Fox filed the current lawsuit, alleging that based on both the language of the 1868 deed and historical use, the Railroad's right-of-way was only 45 feet wide. Fox therefore contended that the construction of the sidetrack on property outside of a 45 foot strip constituted an inverse condemnation of and trespass against his property. Norfolk Southern removed the case to federal court, asserting that Fox's trespass claim was preempted by federal law and asking the court to exercise supplemental jurisdiction over his claim for inverse condemnation. To support its preemption argument, the Railroad relied on the Interstate Commerce Commission Termination Act of 1996 ("ICCTA"), 49 USCS § 10501, et seq. That statute vests exclusive jurisdiction in the Surface Transportation Board with respect to legal remedies related to "the construction, acquisition, operation, abandonment,

or discontinuance of spur, industrial, team, switching, or side tracks, or facilities . . . ." 49 USCS §10501 (b) (2). Specifically, Norfolk Southern argued that Fox's trespass claim sought a remedy related to the construction and operation of a side track because if he prevailed on that claim, the Railroad would be required either to abandon the track or to pay Fox to operate the track. In response, Fox contended that he was seeking damages only for the initial taking of his property and that "[this] trespass claim is duplicative of [the] inverse condemnation claim because both are legal vehicles to ensure that [Fox] is compensated for the loss of his property." Based on this representation, the federal court found that Fox's claims were not preempted because "[t]he issue of whether [the Railroad] wrongfully took [Fox's] property does not relate to the regulation of the Railroad or affect the operation and use of the Railroad. [The Railroad] could continue operating [its] side track and would have to compensate [Fox] only for the initial wrongful taking." The federal court therefore remanded the case to the state court.

Following extensive discovery, Norfolk Southern moved for summary judgment, arguing that because the passing side track was constructed entirely within its 100 foot right-of-way, Fox could not prevail on his claims for trespass and inverse condemnation. After a hearing, the trial court granted the Railroad's motion and

entered judgment in its favor. Fox then filed a motion for reconsideration and sought to file an additional affidavit.[7] In his motion for reconsideration, Fox asserted for the first time that Norfolk Southern's unreasonable interference with his private right of access across the railroad tracks had resulted in the inverse condemnation of that portion of his property situated to the east of the tracks. The trial court accepted the affidavit for filing, and held a hearing on the motion for reconsideration. The trial court thereafter denied the motion, finding that the additional affidavit did not create a factual question as to whether the Railroad had taken Fox's property for construction of the side track. The court further found that Fox's claim for the inverse condemnation of his property east of the railroad tracks (Tracts 2 and 3) was preempted by the ICCTA. Fox now appeals the grant of summary judgment in favor of Norfolk Southern and the denial of his motion for reconsideration.

1. Before addressing the merits of this appeal, we consider whether we have jurisdiction over the same. As noted above, the trial court granted summary judgment in favor of Norfolk Southern on Fox's claim for the inverse condemnation of his

_____

[7] The affidavit was that of William Collins, who Fox alleged was one of his predecessors in title. The affidavit had been executed in 2013, and counsel believed that it had been filed with the court. As a result of a clerical error, however, counsel discovered that the affidavit had not been filed prior to the grant of summary judgment.

property to the east of the railroad tracks after finding that this claim was preempted by federal law. "The preemption doctrine is a product of the Supremacy Clause, see U. S. Const., Art. VI, Cl. 2, which invalidates state laws that interfere with, or are contrary to, federal law." *Norfolk Southern R. Co. v. Zeagler*, 293 Ga. 582, 598 (3) (a) (748 SE2d 846) (2013) (citation and punctuation omitted). And under Georgia law, our Supreme Court has exclusive jurisdiction over appeals "involving construction of the Constitution of the State of Georgia and of the United States in all cases in which the constitutionality of a law, ordinance, or constitutional provision has been called into question." *Atlanta Independent School System v. Lane*, 266 Ga. 657 (1) (469 SE2d 22) (1996); Ga. Const. of 1983, Art. VI, Sec. VI, Para. II. Accordingly, it is well-established that appellate jurisdiction lies exclusively with the Supreme Court of Georgia in cases where a party asserts an affirmative claim of preemption. Thus, where a plaintiff sues seeking declaratory or injunctive relief based on an assertion that a Georgia law, ordinance, or regulation is void in its entirety because it is preempted by federal law, appellate jurisdiction lies in the Supreme Court. See, e. g., *Ward v. McFall*, 277 Ga. 649, 651 (1) (593 SE2d 340) (2004) (direct appeal to the Supreme Court where plaintiff sought a declaration that the child support guidelines set forth in OCGA § 19-6-15 (b) were preempted and therefore

10

unconstitutional); *Davis v. State*, 248 Ga. 783-784 (286 SE2d 430) (1982) (direct appeal to the Supreme Court from denial of defendant's motion to dismiss indictment, in which defendant asserted that the Georgia statute punishing "criminal issuance of a bad check" was preempted in its entirety by federal law). Similarly, our Supreme Court has held that it has exclusive appellate jurisdiction where a plaintiff seeks relief based on an argument that preemption precludes the application of an otherwise valid state law in a specific category of cases. See *Babies Right Start v. Ga. Dept. of Pub. Health*, 293 Ga. 553, 554-555 (1) (748 SE2d 404) (2013) (appellate jurisdiction was in the Supreme Court where the plaintiff sought both a declaration that Georgia's Administrative Procedure Act could not apply to an ALJ's ruling regarding vendor eligibility to participate in the federal WIC program and accompanying injunctive relief).

Traditionally, however, this Court has exercised appellate jurisdiction in those cases that do not involve an affirmative claim of preemption – i.e., where preemption is raised as a defense and where that defense does not involve a direct constitutional challenge to an entire statute, ordinance or regulation on preemption grounds. In other words, we have exercised jurisdiction in those cases where a defendant argues that the plaintiff's otherwise cognizable state law claim is preempted under the

11

circumstances of the particular case. See *Perry v. Intl. Longshoremen Assn. Local No. 1414*, 295 Ga. App. 799, 801 (2) (673 SE2d 302) (2009) (holding that the individual appellants — current and former union members — could not prevail on their defense that federal law preempted the award of amounts each allegedly owed the union); *Parks v. Hyundai Motor America*, 294 Ga. App. 112, 113-114 (1) (668 SE2d 554) (2008) (affirming grant of summary judgment in favor of defendants based on finding that plaintiffs' state law tort claims for defective design and failure to warn were preempted by federal regulations promulgated under the National Traffic and Motor Vehicle Safety Act of 1996); *Continental Pet Technologies v. Palacias*, 269 Ga. App. 561, 562 (1) (604 SE2d 627) (2004) (rejecting employer's defense that the federal Immigration Reform and Control Act of 1986 and regulations promulgated thereunder preempted Georgia law "for employment purposes relating to workers' compensation"); *Smith v. Mitchell Constr. Co.*, 225 Ga. App. 383, 386 (2) (481 SE2d 558) (1997) (affirming grant of summary judgment to defendants and holding that plaintiff's state law tort claims resulting from judgment creditor's violation of bankruptcy stay were preempted by federal bankruptcy law); *Central of Ga. R. Co. v. Markert*, 200 Ga. App. 851, 851-852 (2) (410 SE2d 437) (1991) (finding plaintiff's state law negligence claims based on the railroad's alleged failure to equip its

12

locomotive with adequate safety and warning devices and the alleged operation of that locomotive at excessive speeds were preempted by federal law). But see *Poloney v. Tambrands, Inc.*, 260 Ga. 850, 851 (1) (412 SE2d 526) (1991) (direct appeal to Supreme Court from trial court's grant of partial summary judgment to defendant based on its finding that federal regulations "expressly preempt state tampon warning label requirements for toxic shock syndrome, including those that emanate from state tort law") (citations omitted).

As the foregoing demonstrates, the preemption defense cases in which we have exercised jurisdiction have not required us to determine "the constitutionality of a [specific] law, ordinance, or constitutional provision." Instead, they required us to apply well-settled principles of law to determine whether federal law preempts state law in a specific case, thereby barring the plaintiff's state law cause of action. See generally *City of Philadelphia v. New Jersey*, 430 U. S. 141, 142 (97 SCt 987, 51 LE2d 224) (1977) (in explaining its decision to remand the case to allow the New Jersey Supreme Court to resolve the question of whether federal law preempted a state statute before it addressed whether that statute discriminated against or unduly burdened interstate commerce, the Court noted that while preemption is "ultimately a question under the Supremacy Clause, analysis of pre-emption issues depends

13

primarily on statutory and not constitutional interpretation") (citation and punctuation omitted). And it appears that our Supreme Court has approved of our exercise of jurisdiction in such cases, at least implicitly. See *Perry*, 295 Ga. App. 799 (appeal transferred to Court of Appeals from Supreme Court, even though the asserted defense was based, in part, on preemption); *Allen v. Wright*, 282 Ga. 9, 11-12 (1) (644 SE2d 814) (2007) (addressing a preemption defense and affirming this Court's finding that HIPPA preempted OCGA § 9-11-9.2, which required a medical release form to be filed with a complaint alleging medical malpractice; the Supreme Court made no comment regarding this Court's exercise of appellate jurisdiction); *Advance PCS v Bauer*, 280 Ga. 639 (632 SE2d 95) (2006) (addressing a preemption defense and reversing this Court's decision that plaintiff's state law claims were not preempted by ERISA; the opinion raises no question regarding this Court's exercise of jurisdiction).

Despite our exercise of jurisdiction in appeals involving the assertion of a preemption defense, the Supreme Court's relatively recent decision in *Babies Right Start* warrants closer consideration. In *Babies Right Start*, the appeal was originally filed in this Court, but we transferred the case to the Supreme Court, presumably based on the fact that it involved an affirmative claim of preemption. The opinion

14

noted the transfer and broadly stated that the plaintiff's "*preemption argument* brings the appeal under our constitutional question jurisdiction" and that "the Court of Appeals lack[ed] jurisdiction" over the appeal. 293 Ga. at 554 (1) (citation and emphasis supplied). Although this language arguably could indicate that the Supreme Court has exclusive appellate jurisdiction whenever a preemption question is raised (whether by a plaintiff seeking affirmative relief or by a defendant seeking to avoid liability under traditional state tort or property law), we are mindful that the case involved an affirmative claim of preemption which this Court historically has transferred. Further, this Court has continued to exercise jurisdiction in cases involving a preemption defense.[8] See *Midville River Tract v. Central of Ga. R. Co.*, 339 Ga. App. 546, 549-550 (1) (794 SE2d 192) (2016), cert. denied, Case No. S17C0712 (May 30, 2017) (affirming grant of summary judgment in favor of railroad defendants based on a finding that the Federal Railroad Safety Act preempted plaintiff's state law negligence claims); *PLIVA, Inc. v. Dement*, 335 Ga. App. 398,

---

[8] Citing *Babies Right Start*, we have also transferred to the Supreme Court cases involving an affirmative claim of preemption. See *Community & Southern Bank v. Lovell*, Case No. S17A0765, docketed December 14, 2016 (transfer order noted that a primary issue on appeal is whether the federal Financial Institutions Reform, Recovery, and Enforcement Act of 1989 preempts two Georgia statutes, OCGA § §18-2-79 and 44-12-24).

401-402 (1) (a) (780 SE2d 735) (2015) cert. granted, Case No. S16C0685 (September 6, 2016) (appeal withdrawn February 10, 2017) (reversing trial court's finding that plaintiff's state law negligence claims based on inadequate warnings on prescription drugs were preempted by federal law). In light of that fact, and given that this case involves a preemption defense rather than an affirmative claim of preemption and does not require us to decide whether a specific statute, ordinance, or regulation is preempted in its entirety by federal law, we have presumed to exercise jurisdiction over this appeal. We do so, however, cognizant of the fact that the ultimate responsibility for construing Georgia's constitutional provisions regarding appellate jurisdiction rests with the Supreme Court, and not this Court. See *Saxton v. Coastal Dialysis & Med. Clinic*, 267 Ga. 177, 178 (476 SE2d 587) (1996).

2. We turn now to the merits of Fox's appeal. In his first claim of error, Fox does not dispute that Norfolk Southern constructed the passing track entirely within the 100 foot right-of-way it claims under the 1868 deed. He contends, however, that the Railroad does not, in fact, hold title to that entire right-of-way and that the trial court erred in concluding otherwise. Specifically, Fox argues that under the language of the 1868 deed, the Railroad's right-of-way "was determined by the sighting of the new railroad," and that the "railroad as built stretches no more than [45] feet from

16

ditch to ditch." Fox further contends that the Railroad never used any land beyond the ditches before building the sidetrack. Given these facts, Fox argues that the right-of-way to which Norfolk Southern holds title is, in fact, only 45 feet wide. We disagree.

(a) As an initial matter, we note that it appears that Fox's argument on this issue is foreclosed by OCGA § 46-8-100. Enacted in 2008, that statute provides, in relevant part:

> A railroad company organized and incorporated as provided in this chapter shall be empowered: . . .
> (3) To acquire, purchase, hold, and use all such real estate and other property as may be necessary for the construction and maintenance of said road and of the stations, . . . and all other accommodations necessary to accomplish the object of the corporation; and to condemn, lease, or buy any land necessary for its use; *provided, however, that to the extent an issue arises over the dimensions of any such acquisition by a railroad corporation or railroad company which occurred prior to 1913, such dimensions shall be determined by reference to the documents evidencing any such transaction and by examining the official map of the railroad filed with the Interstate Commerce Commission pursuant to the Railroad Valuation Act of March 1, 1913, Stat. 701, as amended, and such depictions contained on such official railroad map shall be conclusive as to the dimensions of any acquisition as of the date of such railroad map*; . . .

(Emphasis supplied.) Under the plain terms of this statute, the 1913 valuation map showing the Railroad's 100 foot right-of-way is conclusive evidence as to the dimensions of that right-of-way.

In an effort to avoid this statute, Fox argues that because this version of OCGA § 46-8-100 did not become effective until after the construction of the sidetrack, it cannot apply to this dispute, because such an application would "retroactively" deprive Fox of his vested rights in the disputed property. To prevail on this argument, however, Fox was obligated to come forward with some evidence showing that he does, in fact, have an ownership interest in the property at issue — either by virtue of title or by acquisition through adverse possession. As is shown below, however, Fox has failed to present any such evidence.

(b) Fox argues that the language of the 1868 deed, which granted Norfolk Southern's predecessor in interest "a strip of land . . . of sufficient width" on which to build the railroad, not to exceed 100 feet, shows that the deed conveyed to the Railroad only that land which the company actually utilized at the time it built the tracks. Put another way, Fox argues that under the terms of the 1868 deed, the width of the right-of-way was determined by the space physically occupied by the Railroad when it constructed the tracks, that title to the unclaimed portion of the 100-foot

18

right-of-way remained with the landowner, and that title to that property subsequently passed to him. This argument, however, finds no support in the record.

For purposes of determining Fox's taking claim, the relevant question is whether Fox, in fact, holds title to the property in question. And in this case, the record shows that he does not. As noted above, although Fox's deeds of title do not contain a metes and bounds description of the property he was purchasing, each deed incorporates by reference a plat of survey. And under Georgia law, "a deed incorporating a recorded plat by reference as the legal description [of the property] has the same effect as if written out in the deed." *Jones v. Bowen*, 244 Ga. App. 300, 302 (535 SE2d 501) (2000) (footnote omitted). Thus, because each of the surveys incorporated into Fox's deeds shows the Railroad as having a 100-foot right-of-way, the evidence demonstrates that Fox did not take title to any portion of that right-of-way. In other words, regardless of any ambiguity found in the 1868 deed, the record shows that by the time Fox purchased the property, the Railroad held title to a 100

foot right-of-way and that Fox purchased his land with knowledge of that fact.[9] Accordingly, Fox's claim that he holds title to any part of the 100-foot right-of-way is without merit.

(c) Despite the foregoing, Fox argues that in its responses to his Requests to Admit, Norfolk Southern admitted it did not own the property on which it constructed the side track, and that it is bound by the those admissions. We disagree.

Norfolk Southern first contacted Fox by letter about purchasing the additional 40 feet of width adjacent to its right-of-way. Attached to the letter was part of a plat copied from a tax map and showing the Railroad's right-of-way bisecting Fox's property. In addition to depicting Norfolk Southern's 100 foot right-of-way, the plat also showed the additional right-of-way (totaling one-half acre) that Norfolk Southern proposed to acquire from Fox. On the plat an arrow is drawn, pointing to a corner near where the existing right-of-way and the proposed additional right-of-way would

---

[9] Despite Fox's assertions to the contrary, the unrefuted evidence of record shows that the Railroad has historically used the entire 100 foot width. The track supervisor responsible for maintaining the right-of-way bisecting Fox's property testified that Norfolk Southern does, in fact, use all of its right-of-way, though it may not use the entire right-of-way "at all times." The supervisor further explained that the right-of-way "is the only [property] the [Railroad has] to use for our track maintenance. Any materials that need to be unloaded or stockpiled, any debris that we have to remove, has to be done within the limits of the right-of-way."

meet, with the notation "south edge of the culvert."[10] It cannot be determined from the drawing whether the south edge of the culvert is within the 100 foot right-of-way or within the proposed additional right-of-way. It is undisputed, however, that the property on which Norfolk Southern built the new side track includes the south edge of the culvert.

Fox attached a copy of the plat sent to him by the Railroad to his second Requests to Admit, and asked Norfolk Southern to admit that it offered to purchase the property shown on the plat; that the Railroad offered to purchase the property because it did not own that property; that Fox refused to sell the property to Norfolk Southern; and that the Railroad was now in possession of at least part of the property. According to the parties,[11] Norfolk Southern admitted that it "offered to purchase the 40 foot strip" shown on the plat; that it offered to purchase this property because it

---

[10] There are culverts situated within the 100 foot right-of-way, running underneath the railroad tracks.

[11] It appears that Fox never filed Norfolk Southern's responses with the trial court, as no copy of those responses is included in the appellate record. In his brief, Fox cites only to a copy of the Requests to Admit, but that copy does not include the Railroad's responses. In its brief, Norfolk Southern cites to Fox's trial court brief, filed in response to the summary judgment motion, in which Fox quotes both the Requests and the Railroad's purported responses. Given that Norfolk Southern does not challenge Fox's failure to file the responses or dispute the content of those responses, we have assumed that the parties' briefs accurately represent the same.

did not own the same; and that Fox refused to sell the Railroad this property. Norfolk Southern denied, however, that it was in possession of any of the property it had offered to purchase from Fox.

Fox contends that the proposed offer Norfolk Southern made to him shows that the existing right-of-way did not extend past the south edge of the culvert. Based on this interpretation of the plat attached to the offer, Fox reasons that the Railroad's admission that it did not own the property it proposed to buy from Fox constitutes an admission that Norfolk Southern did not own any property beyond the culvert. As noted above, however, it is impossible to determine from the plat the precise location of the southern edge of the culvert. Moreover, the plat does not constitute a survey, and there is no evidence it was taken from a survey. And the option to purchase that the Railroad proposed to have Fox sign and that accompanied its written offer provided, in relevant part, "The area and legal description of the Premises [to be purchased] shall be determined by an accurate field survey as soon as practicable after the execution of this Option . . . ." Additionally, Norfolk Southern denied that it built outside its right-of-way; the plat shows that the Railroad has a 100 foot right-of-way; and Fox does not dispute that if the right-of-way is 100 feet wide, the passing track is situated on Railroad property. In light of this evidence, Norfolk Southern's

22

admission that it did not own the property it proposed to buy from Fox does not create a disputed question of fact as to whether the Railroad's right-of-way is 100 feet wide.

3. Fox argues that even if the Railroad did acquire title to a 100 foot right-of-way, he has gained ownership of a portion of that property (including the portion on which the sidetrack is situated) through adverse possession. One who is claiming title by adverse possession bears the burden of showing that while acting under a claim of ownership, he has been in "public continuous, exclusive, uninterrupted, and peaceable" possession of the land in question for a period of at least 20 years.[12] OCGA § 44-5-161 (3), § 44-5-163; *Arnold v. Shackelford*, 219 Ga. 839, 843 (2) (136 SE2d 384) (1964). The question of whether the facts as alleged by the claimant are sufficient to support a claim of adverse possession is one of law, to be determined by the court. *Henson v. Tucker*, 278 Ga. 859, 861 (1) (630 SE2d 64) (2006). Here, we agree with the trial court that even to the extent they are supported by evidence, the facts asserted by Fox cannot support his adverse possession claim.

---

[12] In this case, it appears that Fox seeks to satisfy the 20-year requirement by tacking his period of possession onto the successive periods of possession by his predecessors in title. See *Steinichen v. Stancil*, 284 Ga. 580, 582 (669 SE2d 109) (2008).

Fox relies on two facts to support his claim of prescriptive title: the existence of a long-standing "hog wire" fence that he contends was situated within the 100 foot right-of-way and the use of the right-of-way by one of his purported predecessors in title, William Collins.[13] Neither of these facts, however, supports a claim of adverse possession.

First, assuming that the fence is located within the Railroad's right-of-way, there is no evidence that the fence was constructed or maintained under a claim of right — i.e., for the purpose of allowing Fox and his predecessors to claim title to the Railroad's property. Fox testified that the fence was there when he purchased the property, and he estimated that it had been there for decades, because in places it was covered in vines, the wire was rusted to the point it was crumbling, and many of the posts were rotting and falling over. The fence was not exclusive to Fox's property,

---

[13] We note there is no evidence in the record showing that Collins was, in fact, a predecessor in interest to Fox. In his brief, Fox cites Collins's affidavit in support of his assertion that from 1976 to 1991 Collins owned that part of the Fox property that lies to the west of the railroad tracks. Collins's affidavit, however, merely states that he "owned property adjacent to the Railroad's right-of-way at issue in this dispute from 1976 through 1991." He further avers that the property he owned consisted of a 9 acre tract "between Old Dalton Road and the Railroad," but he does not further identify that property. In its brief, however, Norfolk Southern does not challenge the assertion that Collins was a predecessor in interest to Fox, and we have therefore assumed that Fox now owns the property referenced in Collins's affidavit.

but continued onto the property of a neighbor who, like Fox, kept cattle. And Fox acknowledged that whoever constructed the fence may have done so to keep cattle off the tracks. The surveyor Fox hired offered similar testimony, acknowledging that he could not tell if the fence was placed to delineate property lines, and that it was possible that the fence had been erected to keep cattle off the tracks.

Fox further testified that he did not know who erected the fence, and that it could have been either a prior property owner or the Railroad. Additionally, Fox opined that to the extent the fence was in the Railroad's right-of-way, its placement may have resulted from the fact that the 1868 deed gave the landowner the right to utilize the property within the right-of-way for agricultural purposes. Finally, in his affidavit, Collins stated that during the 15 years he owned land adjacent to the right-of-way, he maintained an "existing fence" and also maintained a gate in the fence "to allow access across the railroad crossing bordering my property." Collins further averred that "[t]he purpose of this fence and the locked gate was *to prevent intrusions and trespass on the railroad right-of-way* as well as to secure my property." (Emphasis supplied.) Thus, Collins's affidavit establishes that he was not using the fence or the gate to assert ownership of the Railroad's right-of-way.

Moreover, as Fox acknowledged in his testimony, the 1868 deed gave the landowner a limited right to use the land within the right-of-way. And Fox has presented no evidence that any use of the Railroad's right-of-way by Fox and his predecessors was anything other than permissive. See *Woods v. Brannen*, 208 Ga. 495, 496 (67 SE2d 702) (1951). Permissive possession, however, "cannot be the foundation of a prescription until an adverse claim [of ownership] and actual notice [of that claim] to the other party." OCGA § 44-5-161 (b). See also *Drew v. DeKalb County*, 239 Ga. 35, 37 (2) (235 SE2d 528) (1977). For Fox's use of the land to establish adverse possession, therefore, he and his predecessors in interest were required to provide actual notice to Norfolk Southern of their adverse claim to that land. *Woods*, 208 Ga. at 496 (1) (where a deed conveying a right-of-way to a railway company reserved to the landowner the right to cultivate the land up to the tracks "until needed for railway purposes," the landowner's subsequent possession of land within the right-of-way was permissive, and could not ripen into prescriptive title in the absence of an adverse claim and actual notice to the railway of that claim). Id. See also *Drew*, 239 Ga. at 37 (2) (landowner's adverse possession claim as to a railroad's right-of-way failed, where the evidence showed that her use of that land "originated by permission, and that she had given no actual notice to the railroad, or its

26

predecessors in title, of any adverse claim by her to the portion used"). To provide notice of an adverse claim, the use and occupation of the land in question must be "so notorious as to attract the attention of every adverse claimant and so exclusive as to prevent actual occupation by another." *Henson*, 278 Ga. at 862 (1) (punctuation and footnote omitted). See also *Arnold*, 219 Ga. at 843. In this case, however, no evidence shows that the fence served to exclude Norfolk Southern from its right-of-way. With respect to this issue, Norfolk Southern's track supervisor testified that while Norfolk Southern was aware of the fence, it did not consider the fence an encroachment on its right-of-way because the fence did not interfere with the Railroad's access to its property.

4. In his motion for reconsideration, Fox argued for the first time that the Railroad's construction and use of the passing track had resulted in an unreasonable interference with his right of access to his property east of the railroad tracks, and that a question of fact existed as to whether this interference had resulted in a taking of that property.[14] The trial court heard argument on this issue and subsequently denied

---

[14] Although Fox did not raise this argument in his response to the Railroad's motion for summary judgment, the trial court allowed him to pursue the argument as part of his motion for reconsideration, and the trial court ruled on that argument. Accordingly, because the issue was raised and ruled on in the court below, we may consider this claim of error. See *RL BB ACQ I-GA CVL, LLC v. Workman*, 341 Ga.

27

the MFR, based in part on its finding that Fox's claim for the inverse condemnation of Tracts 2 and 3 was preempted by federal statutory law. Fox challenges this ruling on appeal. We agree with Fox that the trial court erred in finding that his claim for the alleged taking of Tracts 2 and 3 was preempted by federal law. Given this fact, and because the record shows a question of fact as to whether the Railroad's interference with Fox's access to his property constitutes a taking of the same, we reverse that part of the trial court's order.

(a) We first note that, despite Norfolk Southern's assertions to the contrary, any unreasonable interference with Fox's ability to access Tracts 2 and 3 can support a claim for inverse condemnation. Under Georgia law, a claim for inverse condemnation arises whenever a governmental or public entity creates a condition with respect to private property that results in a taking of that property. *Ga. Dept.. of Transp. v. Jackson*, 322 Ga. App. 212, 215 (744 SE2d 389) (2013). See also *Waters v. DeKalb County*, 208 Ga. 741, 744 (69 SE2d 274) (1952). Georgia law further recognizes that "[t]he right of access, or easement of access, to a public road is a property right which arises from the ownership of land contiguous to a public road, and the landowner cannot be deprived of this right without just and adequate

App. 127, 139 (6) (a) (798 SE2d 677) (2017).

28

compensation . . . ." *MARTA v. Datry*, 235 Ga. 568, 575 (I) (220 SE2d 905) (1975) (citations omitted). Thus, a taking of property occurs whenever an entity with the power of eminent domain substantially interferes with a landowner's means of ingress and egress to his property, and "[t]he measure of damages is any dimunition in the market value of the property by reason of such interference." *Dept. of Transp. v. Robinson*, 260 Ga. App. 666, 667 (1) (580 SE2d 535) (2003) (footnote omitted).

With respect to such a taking, we note that it is irrelevant that the landowner's access from the public road depends on one or more easements he may have over the property of another — including an easement across railroad tracks. See *Jackson*, 322 Ga. App. 212. In *Jackson*, we affirmed a jury verdict in favor of the plaintiff on his inverse condemnation claim against the DOT, which resulted from the DOT's closure of a driveway that ran from a state highway "across a tract of land with no record of ownership and over a railroad crossing before reaching Jackson's property." Id. at 212. Finding that the evidence supported the conclusion that Jackson had established a prescriptive easement over the driveway, including the railroad crossing, we found that the evidence also supported Jackson's claim for inverse condemnation, based on the DOT's taking of his easement. Id. at 215-216.

Moreover, an inverse condemnation claim is available even when the interference with a property owner's access results from changes made to property owned entirely by the party causing the interference. See *Louisville & N. R. Co. v. Merchants' & Farmers' Bank*, 166 Ga. 310 (2) (a) (143 SE 506) (1928) (where railroad's relocation of its tracks within its right-of-way resulted in local businesses losing ingress and egress to their property, the railroad had affected a taking of that property and was required to compensate the business owners); *Athens Terminal Co. v. Athens Foundry & Machine Works*, 129 Ga. 393, 401 (3) (58 SE 891) (1907) (railroad required to compensate property owner for the taking of its property where the new track, built entirely on property owned in fee simple by the railroad, interfered with the "right of egress and ingress to the lot owned in fee simple by the Foundry Company"); *Robinson*, 260 Ga. App. at 667 (1); *DeKalb County v. Glaze*, 189 Ga. App. 1 (375 SE2d 66) (1988). *Robinson* involved the DOT's decision to eliminate an acceleration/deceleration lane on a public highway that provided access to the Robinson's business. After purchasing property along the state highway and building an automotive repair shop thereon, the Robinsons had constructed the lane pursuant to an agreement with the DOT, to accommodate the tractor-trailer trucks being serviced at their business. *Robinson*, 260 Ga. App. at 666. The Robinsons

30

thereafter deeded the property on which the acceleration/deceleration lane was situated to the DOT, and during a subsequent road widening project, the DOT decided to eliminate that lane. The Robinsons sued for inverse condemnation, claiming that the elimination of the lane interfered with their easement of access. Id. The jury found in favor of the Robinsons and the DOT appealed, arguing that because they owned the property on which the lane was situated, the Robinsons could not assert a taking based on the lane's closure. This Court disagreed, noting that public improvements that result in "a substantial impairment of the property owner's 'easement of access'" may constitute a taking. Id. at 668 (1) (punctuation and footnote omitted). See also *Glaze*, 189 Ga. App. at 2 (1) ("it is well settled that if the installation of [public] improvements results in a substantial impairment of the property owner's 'easement of access,' a taking has occurred for which compensation is required regardless of the importance of the public interests which are thereby promoted"), citing *Dougherty County v. Hornsby*, 213 Ga. 114, 116-117 (1) (97 SE2d 300) (1957).

In this case, it is undisputed that Fox's sole means of ingress and egress from the public road to that part of his property east of the railroad tracks is by means of

31

an easement over the Railroad's right-of-way.[15] Additionally, Fox testified that Norfolk Southern frequently parks trains on the passing track, and thereby blocks his access to Tracts 2 and 3, for up to 24 hours at a time. And according to Fox, the lack of predictable access to Tracts 2 and 3 has rendered that property useless for at least one of the agricultural purposes for which it is zoned — grazing cattle. Given this evidence, a question of fact exists as to whether the passing track substantially interferes with Fox's access to his property to the extent that a taking of that property has occurred. See *Glaze*, 189 Ga. App. at 2 (1) (finding that whether the county's installation of curbs in its existing right-of-way "substantially interfered with" a store owner's access to his property was a "question[ ] of fact to be resolved by the jury"). The trial court, however, never considered the merits of Fox's claim for the taking of

---

[15] It appears that the 1868 deed, which obligates the Railroad to construct and maintain all "necessary" railroad crossings, created an express easement in favor of the landowner. See *Albenberg v. Szalay*, 332 Ga. App. 665, 667-668 (2) (774 SE2d 730) (2015). Alternatively, Fox is entitled under Georgia law to claim an implied easement. Id. at 668-669 (4). See also *Eardley v. McGreevy*, 279 Ga. 562, 563 (1) (615 SE2d 744) (2005).

his property east of the railroad tracks, finding instead that such a claim was preempted by federal statutory law.[16] This ruling was in error.

(b) The trial court found that Fox's claim for the inverse condemnation of the property in question was preempted by the provisions of the ICCTA. Enacted in 1996, this statute abolished the Interstate Commerce Commission and created the Surface Transportation Board ("STB" or "the Board") to administer the Act. See *Elam v. Kansas City Southern R. Co.*, 635 F3d 796, 804 (2) (5th Cir. 2011); 49 USC §§ 10101, 10102 (1). In the ICCTA, Congress expressly conferred on the STB exclusive jurisdiction over the regulation of railroad transportation. With respect to the Board's regulatory authority, the Act provides:

---

[16] On appeal, Fox points to the federal court's remand order, in which the district court found that because Fox's trespass claim was actually a claim for the taking of the property on which the side track was built, the claim was not preempted by federal statute. Fox contends that this order has a preclusive effect, and operated to bar the trial court from considering the issue of preemption. We disagree. Where, as here, a remand order is based on a finding that the district court lacked subject matter jurisdiction, the federal court's order "has no preclusive effect on the state court's resolution of [a defendant's] preemption defense in the same case." *In Re Loudermilch*, 158 F3d 1143, 1146 (11th Cir. 1998). Thus, after being "reinvested with the jurisdiction," "[t]he state court is competent to revisit the district court's determination" as to the issue of preemption. Id. See also *Soley v. First Nat. Bank of Commerce*, 923 F2d 406, 409 (II) (5th Cir. 1991) (where a federal district court's remand order is based on jurisdictional grounds, that order "will have no preclusive effect on the state court's consideration of [a] substantive preemption defense"); 28 USCA § 1447 (c).

The jurisdiction of the Board over

(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State, is exclusive. Except as otherwise provided in this part, *the remedies provided under this part with respect to regulation of rail transportation* are exclusive and preempt the remedies provided under Federal or State law.

49 USC §10501 (b) (emphasis supplied).

Recognizing that the STB "is uniquely qualified to determine whether state law should be preempted by the ICCTA," courts have traditionally looked to STB decisions when analyzing a claim of preemption. *Emerson v. Kansas City S. R. Co.*, 503 F3d 1126, 1130 (III) (A) (10th Cir. 2007). See also *Adrian & Blissfield R. Co. v. Village of Blissfield*, 550 F3d 533, 540 (II) (B) (6th Cir. 2008); *New Orleans & Gulf Coast R. Co. v. Barrios*, 533 F3d 321, 331-332, (III) (B) (5th Cir. 2008); *Green Mountain R. Corp. v. Vermont*, 404 F3d 638, 642 (II) (2d Cir. 2005). In 2005, the Board articulated a framework for analyzing preemption claims, and under that

34

framework, state and local laws and/or claims asserted under those laws may be preempted either categorically or as applied.[17] *CSX Transp., Inc.–Petition for Declaratory Order*, 2005 WL 1024490, at \*2-3 (STB May 3, 2005). See also *Barrios*, 533 F3d at 322 (describing the STB's analytical framework); *Wedemeyer v. CSX Transp.*, 850 F3d 889, 894-895 (II) (7th Cir. 2017). A state or local law (and any action brought thereunder) is categorically preempted if the law itself or the remedy it provides "directly conflict[s] with exclusive federal regulation of railroads" and

---

[17] Federal courts have recognized that the STB's use of the term "categorical preemption" refers to what is more commonly known as express preemption, while its use of the term "as applied preemption" refers to what is more commonly known as implied preemption. See *Franks Investment Co. v. Union Pacific R. Co.*, 593 F3d 404, 409-414 (II) (5th Cir. 2010) (en banc); *PCS Phosphate Co. v. Norfolk Southern Corp.*, 559 F3d 212, 217-218 (II) (A), 220-221 (4th Cir. 2009).

thereby unreasonably burdens interstate commerce.[18] *CSX Transp.*, 2005 WL 1024490 at\*3 (1). See also *Union Pacific R. Co. v. Chicago Transit Auth.*, 647 F3d 675, 679 (II) (7th Cir. 2011).

The second category of preempted state laws are those that are preempted as applied. The as-applied preemption analysis is used in those cases involving a

---

[18] Categorically preempted laws and actions fall into one of two categories. The first is any form of state or local permitting or preclearance, that by its nature, could be used to deny a railroad the ability to conduct some part of its operations or to proceed with activities that the Board has authorized. Second, there can be no state or local regulation of matters directly regulated by the Board – such as the construction, operation, and abandonment of rail lines; railroad mergers, line acquisitions, and other forms of consolidation; and railroad rates and service. Both types of categorically preempted actions by a state or local body would directly conflict with exclusive federal regulation of railroads. . . . In other words, state and local laws that fall within one of the precluded categories are a *per se* unreasonable interference with interstate commerce.

*CSX Transp.*, 2005 WL 1024490 at *2-3 (citations and footnotes omitted). See also *Barrios*, 533 F3d at 332 (III) (B). Accordingly, when deciding whether a state law or cause of action is categorically preempted, the "analysis is addressed not to the reasonableness of the particular state or local action, but rather to the act of regulation itself." *CSX Transp.*, 2005 WL 1024490, at *3 (1). See also *Barrios*, 533 F3d at 332 (III) (B).

36

traditional state law cause of action — i.e., a cause of action that arises under generally applicable statutory or common law that is not directed specifically at railroads or their property. See *Tubbs v. Surface Transp. Bd.*, 812 F3d 1141, 1144-1145 (II) (A) (8th Cir. 2015) (using the as-applied analysis to determine whether plaintiff's numerous state law claims, including a claim for inverse condemnation were preempted under the ICCTA); *Island Park, LLC v. CSX Transp.*, 559 F3d 96, 99 (2d Cir. 2009) (conducting an as-applied analysis to determine whether federal law claims for taking of property without compensation were preempted); *Union Pacific*, 647 F3d at 679-680 (II) (A) (because state-law condemnation actions are necessarily fact-dependent proceedings, the question is whether the action was preempted as applied); *Franks*, 593 F3d at 411 (II) (A) (as-applied analysis controls suit governed by Louisiana property law, as that law was not intended "to regulate railroad transportation"); *Guild v. Kansas City Southern R. Co.*, 541 Fed. Appx. 362, 368 (IV) (5th Cir. 2013) (as-applied analysis governs negligence suit brought under Mississippi tort law for damage done by railroad to a privately-owned spur track adjoining the railroad's main track); *Norfolk Southern Railway Co. – Petition for Declaratory Order*, 2013 WL 5891582 *3 (STB November 4, 2013) (the as-applied analysis controls the question of whether the ICCTA preempts state law claims for

37

inverse condemnation). In such cases, preemption occurs not because the law itself seeks to regulate railroads, but because allowing a particular state law claim to proceed would "have the effect of unreasonably burdening or interfering with rail transportation." *Franks*, 593 F3d at 414 (II) (A). See also *CSX Transp.*, 2005 WL 1024490 at *3. The question of whether a state law cause of action is preempted as applied is a fact-specific one, and depends heavily on the circumstances of a particular case. *Tubbs*, 812 F3d at 1144; *Norfolk Southern*, 2013 WL 5891582 at *3 (1).

Here, because Fox is asserting a traditional state law claim for inverse condemnation, we analyze Norfolk Southern's preemption defense under the as-applied standard. *Tubbs*, 812 F3d at 1144 (II) (A). Specifically, "we must assess whether, as applied to the facts of this case, [Georgia inverse condemnation law] would have the effect of unreasonably burdening or interfering with rail transportation." *Guild*, 541 Fed. Appx. at 367-368 (IV). See also *Adrian & Blissfield R. Co.*, 550 F3d at 540 (II) (B).

Despite the fact that Norfolk Southern, as the party asserting federal preemption, bears the burden of proving that the doctrine applies in this case, *Guild*, 541 Fed. Appx. at 368, its brief neither offers any argument nor cites to any evidence

38

showing that rail transportation will be burdened if Fox should prevail on his inverse condemnation claim.[19] Instead, Norfolk Southern argues that Fox's claim is preempted because it arises out of the construction and use of a side track. While that fact is certainly relevant for purposes of analyzing the question of preemption, it is not determinative of that question. Instead, as explained above, Norfolk Southern is required to show that Fox's inverse condemnation claim, if successful, would burden or interfere with rail transportation. Moreover, the Railroad must be able to identify an articulable, specific burden or interference that Fox's claim would impose on rail transportation. Id. (to show that a state law claim is preempted by the ICCTA, a railroad must come forward with something more than "general evidence or assertions" that the claim "would somehow affect rail transportation"); *Franks*, 593 F3d at 415 (II) (A) (reversing a district court's finding that a Louisiana law granting landowners the right to establish private, grade-level crossings on railroad property was preempted by the ICCTA; the appellate court noted that the railroad showed only that, as a general rule, railroad crossings affect rail transportation in incidental ways

---

[19] Indeed, all of the briefs submitted in this case by both Norfolk Southern and Fox have provided little guidance with respect to the question of preemption. Specifically, neither party's briefs (including the supplemental briefs on preemption requested by this Court) identify or apply the relevant test for determining whether the ICCTA preempts Fox's state law claim for inverse condemnation.

and it failed to tie any of the problems generally associated with crossings, such as increased costs, drainage problems, or decreased rail speeds, to the crossings at issue). Based on the current record, Norfolk Southern has failed to make this required showing.

In its brief, Norfolk Southern attempts to equate Fox's claim for inverse condemnation with a state law claim for continuing nuisance,[20] and it seems to argue that the relief afforded by such a claim would interfere with railroad operations. This argument, however, ignores the fact that under Georgia law, a claim for continuing nuisance affords very different relief than that afforded by a claim for inverse condemnation. A plaintiff who prevails on a claim for continuing nuisance may recover accrued damages (i.e., all damages that have accrued within the four years preceding the suit) for not only any physical damage to property but also "for annoyance and discomfort caused by such nuisance as a result of the maintenance of the [same]." *Weller v. Blake*, 315 Ga. App. 214, 216 (1) (726 SE2d 698) (2012). See also *Reid v. Gwinnett County*, 242 Ga. 88, 89 (249 SE2d 559) (1978). Furthermore,

---

[20] To the extent that Norfolk Southern is arguing that Fox has asserted that the sidetrack constitutes a permanent nuisance (i.e., a nuisance that cannot be abated), we note that a permanent nuisance can give rise to a claim for inverse condemnation. See *Liberty County v. Eller*, 327 Ga. App. 770, 771-772 (761 SE2d 164) (2014).

a continuing nuisance claim subjects a defendant to an award of punitive damages, and it also allows the plaintiff to obtain injunctive relief requiring the defendant to take affirmative action to abate the nuisance. *Reid*, 242 Ga. at 89, *Weller*, 315 Ga. App. at 219 (3) (a). See also *Hoffman v. Atlanta Gas Light Co.*, 206 Ga. App. 727, 731 (2) (426 SE2d 387) (1992) (the maintenance of a nuisance "is the failure to abate the nuisance after notice by the injured party"). By contrast, a plaintiff who prevails on a claim for inverse condemnation is entitled to a one-time, lump sum payment to compensate him for the losses he suffered as a result of the taking of his property. See *Robinson*, 260 Ga. App. at 667 (1).

Here, Fox has never sought any type of equitable relief against the Railroad, and he has maintained throughout this litigation that the only relief he is seeking is monetary compensation for the alleged taking of his property.[21] Thus, unlike

---

[21] We note that given Fox's representations to the federal district court, the Superior Court of Gordon County, and this Court as to the type of relief he is seeking, he would be judicially estopped from seeking a different type of relief on remand. Under the doctrine of judicial estoppel, a party cannot take a position, persuade a court to accept the same, and then later assert an inconsistent position. See *Georgia Neurology & Rehabilitation, P. C. v. Hiller*, 310 Ga. App. 202, 206 (2) (a) (712 SE2d 611) (2011). See also *Kamara v. Henson*, 340 Ga. App. 111, 112 (1) (796 SE2d 496) (2017) ("[t]he essential function and justification of judicial estoppel is to prevent the use of intentional self-contradiction as a means of obtaining unfair advantage in a forum provided for suitors seeking justice").

continuing nuisance claims that courts often find are preempted by the ICCTA, Fox's action does not seek damages that accrue with each use of the sidetrack and that result from the byproducts of "conventional and routine rail operations," including "noises, vibrations, and various discharges," that are conducted "on the rail carrier's own property." *Norfolk Southern*, 2013 WL 5891582 at *3. See also *Pace v. CSX Transp.*, 613 F3d 1066, 1069 (III) (11th Cir. 2010) (finding that the ICCTA preempted state law nuisance claims seeking monetary damages resulting from noise and smoke coming from a newly-constructed side track); *Guckenberg v Wisconsin Central Ltd.*, 178 FSupp.2d 954, 958 (II) (B) (E. D. Wis. 2001) (state law nuisance claims seeking compensatory and punitive damages for interference with plaintiff's use and enjoyment of their property resulting from noise and smoke generated by railcars on newly constructed side track was preempted). Nor is Fox seeking injunctive or declaratory relief that would require Norfolk Southern to modify or abandon its use of the sidetrack. See *Maynard v. CSX Transp.*, 360 FSupp.2d 836, 838, 841-842 (plaintiffs' state law nuisance claims alleging that the railroad's use of a side track blocked access to their homes for up to six hours at a time was preempted in part because it sought injunctive relief against the railroad and therefore sought to regulate or interfere with railroad operations). Additionally, Fox does not seek to dispossess

42

the Railroad from its property. See *Wedemeyer v. CSX Transp.*, 850 F3d at 898 (II) (lawsuit that sought to eject railroad from land with active, ongoing rail operations, after railroad resumed use of a previously abandoned track was preempted). Finally, Fox's inverse condemnation claim is unique to Fox — i.e., it is not a claim that can be asserted by all "owners of property near operating rail lines anywhere." *Norfolk Southern*, 2013 WL 5891582 at *3. Given the circumstances of this case, therefore, we cannot say that Fox's claim for inverse condemnation would unreasonably

interfere with or otherwise burden rail transportation.[22] Accordingly, the trial court

erred when it found that this claim was preempted by the ICCTA.

For the reasons set forth above, we affirm the trial court's grant of summary

judgment to Norfolk Southern on Fox's claim for inverse condemnation of the

---

[22] We note that the "blocked crossing" cases on which the Railroad seeks to rely are not relevant to Fox's claim for inverse condemnation. See *Elam v Kansas City Southern R. Co.*, 635 F3d 796 (5th Cir. 2011); *Friberg v. Kansas City Southern R. Co.*, 267 F3d 439 (5th Cir. 2001); *Burlington Northern & Santa Fe R. Co. v. Dept. of Transp.*, 206 P3d 261 (Or. App. 2009); *City of Seattle v. Burlington Northern R. Co.*, 41 P3d 1169 (Wash. 2002); *Canadian Nat. R. Co. v. City of Des Plaines*, 2006 WL 345095 (Ill. App. 2006). Both *Elam* and *Friberg* involved claims of negligence per se based on a state "anti-blocking" statute–i.e., a law that purported "to regulate the amount of time the train [could] occupy a crossing." *Elam*, 635 F3d at 801. See also *Friberg*, 267 F3d at 441, n. 2. *Burlington Northern*, *City of Seattle*, and *Canadian National* all involved a railroad's challenge to civil penalties imposed by a governing authority for the railroad's violation of a state regulation or municipal ordinance that sought to regulate the amount of time a train could occupy a crossing. In each case, the court found that the anti-blocking statute, ordinance, or regulation was categorically preempted because it was targeted specifically at railroad companies and sought to regulate railroad operations. *Elam*, 635 F3d at 804 (III) (A) (2); *Friberg*, 267 F3d at 443; *Burlington Northern*, 206 P.3d at 474; *City of Seattle*, 41 P3d at 1172; *Canadian Nat.*, 2006 WL 345095 at *3. Such laws and regulations were preempted because "regulating the time the train can occupy a rail crossing impacts, in such areas as train speed, length and scheduling, the way a railroad operates the trains, with concomitant economic ramifications . . . ." *Friberg*, 267 F3d at 443 (II). See also *Elam*, 635 F3d at 807 (III) (A) (3) (antiblocking statutes are preempted because they "directly attempt[ ] to manage or govern a railroad's decisions in the economic realm[,]" and these economic effects "are not merely incidental to an otherwise valid state law").

property on which the new side track was constructed. We reverse the grant of summary judgment to Norfolk Southern on Fox's claim for inverse condemnation of his property located to the east of the railroad tracks.

*Judgment affirmed in part and reversed in part. Rickman and Reese, JJ., concur.*