**FOURTH DIVISION**
**DILLARD, P. J.,**
**HODGES, J. and SENIOR JUDGE FULLER**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

October 3, 2025

# In the Court of Appeals of Georgia

A25A1138, A25A1139. DURDEN et al. v. TWIN PRIMES, LLC; and vice versa.

HODGES, Judge.

In 2017, Twin Primes, LLC ("Twin Primes") filed a complaint against neighboring property owners Randall and Janice Durden (collectively "the Durdens") and Florida-Blue Ridge Corporation ("FBR"),[1] asserting claims for quiet title and various tort claims related to a portion of the "Contour Line Property" that is next to its property on Lake Blue Ridge. In their answer, the Durdens asserted counterclaims for quiet title and various tort claims related to the Contour Line Property, as well as cross-claims against FBR. Pursuant to the Quiet Title Act,[2] the matter was submitted

---

[1] FBR is not a party to these appeals.

[2] OCGA § 23-3-60 et seq.

to a special master. After the denial of partial summary judgment and following an evidentiary hearing, the special master issued a report recommending that title be awarded to Twin Primes for the disputed Contour Line Property below the 1700-foot contour line, referred to as "the meadow", and title be awarded to the Durdens for the Contour Line Property above of the 1700-foot contour line ("the Durden tract"). Following another hearing, the trial court adopted the special master's findings of fact and conclusions of law.

The Durdens and Twin Primes now challenge the trial court's order.[3] In Case No. A25A1138, the Durdens appeal the trial court's award of title to the meadow to Twin Primes, asserting that Twin Primes had not demonstrated exclusive possession of the property, or, in the alternative, the property should have been partitioned between the parties. In Case No. A25A1139, Twin Primes appeals the trial court's

---

[3] This is the second appearance of these appeals before this Court. In Case Nos. A24A1724 & A24A1725, we dismissed the parties' appeals challenging the trial court's order for failing to follow the interlocutory appeal procedure, as the order did not address many of the parties' claims, counterclaims, and cross-claims. See id. (dismissed July 11, 2024). Following remittitur, the parties sought and the trial court granted a consent order to re-enter the order adopting the special master's report and certifying a final judgment pursuant to OCGA § 9-11-54 (b) as to the quiet title issues. Because the trial court reissued its order and expressly directed the order to be final as to the issues presented by these appeals, we have jurisdiction to consider them. See *Sam's Wholesale Club v. Riley*, 241 Ga. App. 693, 695 (1) (527 SE2d 293) (1999).

award of title to the Durden tract to the Durdens, arguing that the boundary line agreement that the special master relied upon was not valid or not delivered as required by law. These cases have been consolidated for appeal. For the following reasons, we find no error and affirm the trial court's ruling in both cases.

When reviewing a trial court's order adopting the findings of a special master in a quiet title case, "the court's decision is upheld by the appellate court unless clearly erroneous." *McGregor v. River Pond Farm*, 312 Ga. App. 652, 653 (1) (719 SE2d 546) (2011). "Therefore, if there is any evidence supporting the judgment of the trial court, it will not be disturbed. But conclusions of law are reviewed de novo." (Citations and punctuation omitted.) Id.

So viewed, the evidence shows that in 1928, FBR acquired title to certain property on the shoreline of Lake Blue Ridge, which is now the disputed Contour Line Property. FBR was administratively dissolved in 1946. In 1961, Elton Eason purchased what is now the Twin Primes property on Lake Blue Ridge. The Twin Primes property has been used by the Eason family since 1961.[4] The Durdens purchased their

---

[4] Elton Eason conveyed the property to Eason Second Generation Holdings, LLC in 2002, which conveyed the property to Twin Primes in 2014. Twin Primes' membership consists of various members of the Eason Family and its purpose is to own the Lake Blue Ridge property.

property on Lake Blue Ridge in 2013. The chain of title for the property the Durdens own began by a 1956 deed to William Dickey which was conveyed to H. C. Dickey in 1983. That same year, H. C. Dickey conveyed title to John and Linda Webb, who later conveyed their interest to the Durdens. The Twin Primes property and the Durdens' property share a common boundary with each other and each borders the Contour Line Property. As part of the sale of the property to the Webbs, H. C. Dickey and Elton Eason recorded a boundary line agreement which set the boundary lines between their properties. The boundary line agreement incorporated by reference a survey plot which set the new property lines.

In 1961, the Easons affixed a dock to the shoreline of the meadow. The Easons made a path from their home, through the meadow, and to the dock, which was improved with stones and flagstones into a permanent path between 1983 and 1985. In addition to placing a dock, the Easons mowed the meadow. After H. C. Dickey lost access to his dock in 1979, the Easons agreed to allow the Dickeys to use their dock in exchange for the Dickeys assisting in mowing the meadow from time to time. The Dickeys would mow the meadow approximately a third of the time. After the Dickeys

sold their property to the Webbs in 1993, the Easons agreed to allow the Webbs to use the meadow and the dock in exchange for continuing to mow the property.

Shortly after the Durdens purchased their property, they began construction projects. The Durdens' construction blocked the Easons' view of the lake from their home, and the Easons became concerned that the Durdens were, in fact, building on their property. Additionally, the Durdens built concrete patios in the meadow. While the Easons were researching deeds in an effort to understand why the Durdens believed that they owned the property, they discovered that the meadow actually belonged to FBR. The Easons sent a cease and desist letter to the Durdens to stop the construction.

In 2017, Twin Primes filed its complaint against the Durdens and FBR, asserting claims for quiet title, a declaratory judgment, trespass, nuisance, ejectment, adverse possession of the meadow, and attorney fees. The Durdens filed an answer, asserting counterclaims for quiet title, a declaratory judgment, trespass, costs of litigation, punitive damages, and an interlocutory injunction. The Durdens also asserted cross-claims against FBR for quiet title, a declaratory judgment, and an interlocutory injunction. Following discovery and evidentiary hearings, the special

master recommended, and the trial court ordered that title be awarded to Twin Primes for the meadow by adverse possession and to the Durdens for the Durden tract pursuant to the boundary line agreement. Both parties have appealed, and for the reasons that follow we affirm the trial court's order.

Case No. A25A1138

In this case, the Durdens, as appellants, claim in related enumerations of error that the trial court erred in awarding the entirety of the meadow to Twin Primes. Specifically, the Durdens raise the following arguments: (1) it was error to award title to the meadow based on adverse possession because Twin Primes never had exclusive possession of any portion of the meadow; (2) the Durdens and Twin Primes were joint-tenants of the meadow, and it was error to award the meadow to Twin Primes without a claim of exclusive ownership and ouster; and (3) the trial court erred in failing to partition the meadow. For the reasons set forth below, all three arguments fail.

1. The Durdens first assert that Twin Primes failed to show that it claimed title by adverse possession because its possession and use of the meadow was not open and notorious to the exclusion of others. The Durdens claim that while Twin Primes

6

merely installed a dock and constructed a walkway, the Durdens' predecessors-in-interest, the Webbs, built a gazebo and a shed, treated the dock as their own, and constantly mowed and maintained the meadow. We are unpersuaded.

"[W]here, as here, two persons enter onto property each claiming an interest therein, he who is the true owner or has the better title is deemed to be in possession thereof unless he is dispossessed by the other person." *Carter v. Becton*, 250 Ga. 617, 618 (4) (300 SE2d 152) (1983). OCGA § 44-5-161 (a) outlines the essential elements for adverse possession: (1) possession; (2) not originated in fraud; (3) that is public, continuous, exclusive, uninterrupted, and peaceable; and (4) accompanied by a claim of right. A party without written evidence of title must satisfy these requirements for 20 years. See OCGA § 44-5-163. "'Exclusive possession' means that the disseizor must show an exclusive domain over the land and an appropriation of it to his own use and benefit." (Citation and punctuation omitted.) *Carter*, 250 Ga. at 618 (4). Additionally, "an adverse claimant's possession need not be absolutely exclusive; it need only be a type of possession which would characterize an owner's use." (Citation and punctuation omitted). *Ga. Power v. Irvin*, 267 Ga. 760, 762 (1) (a) (482 SE2d 362) (1997). "[A] permissive use cannot be the foundation for a claim of prescriptive or

adverse possession until the user notifies the owner that he has changed his position from that of mere licensee to that of a prescriber." *Diass v. Bennett*, 273 Ga. App. 784, 787 (1) (b) (616 SE2d 114) (2005).

"The question of whether the facts as alleged by [Twin Primes] are sufficient to support a claim of adverse possession is one of law to be determined by the court." *Fox v. Norfolk Southern Corp.*, 342 Ga. App. 38, 50 (3) (802 SE2d 319) (2017). As noted above, questions of law in these cases are reviewed de novo. *McGregor*, 312 Ga. App. at 653 (1).

Here, the special master concluded that the facts set forth above vested title for the meadow by adverse possession to Twin Primes' predecessor-in-interest, Elton Eason, by 1981, because he satisfied the elements for adverse possession for the first 20-year period that he owned the property. FBR, the deeded owner of the meadow, was dissolved in 1946, and when Elton Eason purchased his property in 1961, he built a dock on the meadow property, a walkway from his home to the dock, and began maintaining the meadow by mowing the property. The Durdens point to no evidence in the record that anyone besides the Easons used the meadow from 1961 until 1979, when H. C. Dickey began using the dock as well. The Easons permitted Dickey to use

the meadow in exchange for his assistance in maintaining the meadow by mowing the property.

The Durdens point to the Supreme Court's decision in *Friendship Baptist Church v. West*, 265 Ga. 745 (462 SE2d 618) (1995), to argue that such use is not so exclusive as to provide prescriptive title. In *Friendship Baptist Church*, a divided Supreme Court found that a church's mowing and occasional clean up of an adjoining property was not sufficient to establish as a matter of law that the church was entitled to title by adverse possession, even when the church rented part of the adjoining property for sign companies to maintain billboards. See id. at 745-746. The Supreme Court noted that mowing and occasional clean up alone "is not generally sufficient to constitute actual possession, much less to require such conclusion as a matter of law." Id. at 746. Moreover, the Supreme Court observed that "the billboards would give notice of nothing more than an easement, as is the case with telephone and power lines and poles." Id. at 745.

Pretermitting whether a dock on shoreline property is analogous to signs and power lines, the Durdens' reliance on *Friendship Baptist Church* is misplaced. In that case, the Supreme Court did not determine that the church's possession was not

9

exclusive, it simply concluded that "the issue of actual possession becomes a question of fact[.]" (Citation and punctuation omitted). *Friendship Baptist Church*, 265 Ga. at 746. Accordingly, as in *Friendship Baptist Church*, the facts set forth above created a fact issue for the trier of fact to resolve. In the instant case, the special master, as the trier of fact, determined that the Easons' acts in the meadow exercised dominion over the land sufficient to satisfy adverse possession's statutory requirement for exclusive possession. "Where there is some evidence on either side of this issue, a reviewing court should not disturb the verdict." Id.

The Durdens also heavily rely on testimony from one of the Eason family members that "we all used the meadow[,]" as well as the fact that the Webbs made improvements to the meadow to demonstrate that the Easons' possession was not exclusive. It is clear from the record, however, that this quote was in response to a question regarding the Webbs' use of the meadow, and not that of their predecessors-in-interest. As such, these facts only relate to the Webbs' use of the meadow after they purchased their property in 1993. Because the special master concluded that Twin Primes established title to the meadow in 1981, whether or not the Easons' use of the

meadow after that point was exclusive cannot be relevant to determine if they established title.

Moreover, as set forth above, the Webbs' use of the meadow was permissive; they were given permission by the Easons to use the meadow in exchange for their assistance in maintaining the property. Thus, the Webbs' use of the meadow was consistent with the Easons' ownership of the property. See *Ga. Power*, 267 Ga. at 764 (1) (a) (concluding that while an adverse possession claimant's limited use of property was not "absolutely exclusive, it was consistent with ownership, and was sufficiently exclusive to satisfy OCGA § 44-5-161 (a) (3)") (citation and punctuation omitted).

The Durdens' reliance on their own encroachment into the meadow is also unpersuasive. The Durdens' non-permissive use of the meadow began 32 years after Twin Primes' predecessor-in-interest established title, and as set forth above, quickly spurred action by Twin Primes to end their alleged trespass, consistent with its ownership of the property. Finally, to the extent that the Durdens claim prescriptive title of the meadow by tacking their use of the meadow to the Webbs' use of the meadow, the Webbs' use of the meadow with the Easons' permission is fatal to such a claim. See *Diass*, 273 Ga App. at 787 (1) (b).

11

Because there was sufficient evidence to show that Twin Primes' predecessor-in-interest gained title to the meadow in 1981 by adverse possession, the trial court did not err in awarding title to Twin Primes.

2. The Durdens next argue that they and Twin Primes are "at worst" joint-tenants in the meadow, and therefore Twin Primes cannot gain title to the meadow without a claim of exclusive possession and ousting the Durdens (or their predecessors) from the meadow.[5] Based on our conclusion in Division 1 (a), this argument fails.

OCGA § 44-6-123 provides, in relevant part, that "[t]here may be no adverse possession against a co[-]tenant until the adverse possessor effects an actual ouster, retains exclusive possession after demand, or gives his co[-]tenant express notice of adverse possession." The Durdens assert that "[s]imply put, there are no facts in the record to even hint at the occurrence of the notice and ouster needed to dispossess the Durdens of their use of [the meadow]." Setting aside the cease and desist letter and other acts that led to the instant case, the Durdens' argument here fails for the same

_____

[5] We note that Twin Primes asserts that the Durdens have waived this argument by failing to raise it below. The Durdens, however, raised this issue as an alternative argument in their objection to the special master's report. Therefore, the issue is preserved for our review.

reason as their argument above: Twin Primes' predecessor-in-interest established title to the meadow decades before the Durdens' began their use of the meadow. Thus, the parties were not co-tenants and OCGA § 44-6-123 has no application to the facts of this case.

3. Finally, the Durdens claim as error the trial court's failure to partition the meadow. They rely on the statutory commandment contained in OCGA § 44-6-141, related to controversies between tenants-in-common, that "the court will mold its decree to meet the general justice and equity of each co[-]tenant[.]" The Durdens assert that the trial court should have followed the recommendations of a certain surveyor to equitably divide the property. Because we have found that the Durdens and Twin Primes are not co-tenants, OCGA § 44-6-141 has no application to this case. The Durdens have not suggested there is any other statutory authority for the trial court to partition the property. Thus, this argument is meritless.

Case No. A25A1139

4. In this case, Twin Primes, now as the appellant, claims the trial court erred in awarding title to the Durden tract to the Durdens. Twin Primes asserts that the special master erred in concluding that the boundary line agreement, which the

13

superior court relied on to award title, was "valid, effective and controls the ownership[.]" In essence, Twin Primes argues that the boundary line agreement that was recorded in 1993 is ineffective because the agreement had no meeting of the minds or was not properly delivered. Because we find there was some competent evidence, including testimony from the Easons, that the agreement is binding, we find no legal error and affirm.

Giving appropriate deference to the special master, see *McGregor*, 312 Ga. App. at 653 (1), the record shows that in April 1993, H. C. Dickey and Elton Eason entered into a boundary line agreement to set the Eason (now Twin Primes) property line below the 1,700 foot contour line of Lake Blue Ridge. Before trial, Elton Eason testified that in 1993 a surveyor wanted him to agree that H. C. Dickey's property started "where it was closest to the 1700 contour line" and that he agreed in order to "help[] out a neighbor[.]" At trial, Elton's wife, Debbie Eason, testified that she remembered the boundary line agreement "wasn't a big deal for us. We just – [Elton] was doing a favor for [H. C.] and that was it." The boundary line agreement incorporates the 1993 survey by reference to set the boundaries of the property and the agreement was recorded on August 20, 1993.

The notary who witnessed Eason and Dickey execute the boundary line agreement also testified at trial that in situations, as here, where a document referred to an attachment, the closing attorney (who is now deceased) would have provided an opportunity for the parties to review that document. The notary also testified that the closing attorney would not have authorized a person to sign a document that referenced an attachment without that person having reviewed the attachment. The standard procedure at the time was for a closing attorney to present an original document in the clerk of court's office, and the clerk would type the plat information into the original document.

Twin Primes argues that the trial court erred in finding the boundary line agreement was valid. It has produced a second copy of the boundary line agreement, which is identical to the recorded boundary line agreement, but lacks the supplied plat and page numbers, which Elton Eason testified he took home after the meeting and "thought that was the end of it." Twin Primes asserts, without any meaningful authority, that the recorded boundary line agreement does not reflect what was agreed to, and therefore there was no meeting of the minds. This argument, however, is belied by the record, where Eason testified that he agreed to the boundary line

agreement and the notary testified that Eason would have been required to review the survey before signing the document. Thus, this appears to have been, at most, a factual dispute for the special master to resolve. See *McGregor*, 312 Ga. App. at 653 (1) (noting that once the trial court adopts the special master's findings of fact and enters judgment, "if there is any evidence supporting the judgment of the trial court, it will not be disturbed") (citation and punctuation omitted). Because there was some evidence to support that the recorded boundary line agreement is authentic, we must reject Twin Primes' invitation to engage in the weighing of evidence. We also reject its argument that the boundary line agreement was not delivered for the same reason, being premised wholly on its belief that the boundary line agreement is inauthentic, which was rejected by the trial court.

Twin Primes also argues that because the boundary line agreement, if authentic, was modified by the clerk's office by adding plat and page numbers, it is invalid. Unlike Twin Primes' factual arguments, this argument actually raises a question of law. "To be valid, a deed must be in writing, signed by the maker, attested by at least two witnesses, supported by consideration, and delivered to the purchaser or his representative." *Z & Y Corp. v. Indore C. Stores, Inc.*, 282 Ga. App. 163, 173 (2) (b)

(638 SE2d 760) (2006); see OCGA § 44-5-30. "It follows that, if a deed is materially altered after the attestation but before it is recorded, it may not be recorded until it is reattested." *Z & Y Corp.*, 282 Ga. App. at 173 (2) (b). Twin Primes does not argue that a clerk supplying a plat and page number to an instrument is a material alteration and cites no authority suggesting that this Court should consider such a change material.[6] Thus, this argument is deemed abandoned. See Court of Appeals Rule 25 (d) (1) ("Any enumeration of error that is not supported in the brief by citation of authority or argument may be deemed abandoned.").

Even if Twin Primes did not abandon this argument, it is unpersuasive. The boundary line agreement (and Eason's purported second signed copy) clearly referred to the survey that would control property line boundaries. "For more than a century, it has been recognized that a purchaser of land in this state is charged with notice of every fact shown by the records, and is presumed to know every other fact which an examination suggested by the records would have disclosed."(Citation and punctuation omitted). *Deljoo v. SunTrust Mortg. Inc.*, 284 Ga 438, 439 (668 SE2d 245)

---

[6] While Twin Primes argues that any modification of an instrument invalidates the instrument, our cases clearly require an instrument to be "materially altered[.]" *Z & Y Corp.*, 282 Ga. App. at 173 (2) (b).

(2008); see also *Commodity Credit Corp. v. Wells*, 188 Ga. 287, 289-290 (2) (3 SE2d 642) (1939) ("It is only when a description is manifestly too meager, imperfect, or uncertain to serve as adequate means of identification that the court can adjudge the description insufficient as matter of law."); *Smith v. Fed. Land Bank of Columbia*, 181 Ga. 1, 2-3 (181 SE 149) (1935) (deed was not void because of insufficient description where it listed the property in the wrong district but contained other correct identifying information). Based on these principles, Eason is charged with knowing the contents of the survey incorporated by reference in the boundary line agreement, and we cannot say that the clerk providing the plat and page number of the survey was a material change. Accordingly, this argument also fails.

In sum, the appellants in both cases have centered most of their arguments on factual disputes that cannot provide any relief under our standard of review, and the only argument raising a question of law was abandoned. The trial court did not clearly err in awarding title to the meadow to Twin Primes because there was competent evidence that its predecessor-in-interest demonstrated exclusive possession of the land. Similarly, we conclude that the trial court did not clearly err in awarding title to

the Durdens for the Durden tract because there was competent evidence that the boundary line agreement was binding between the parties.

*Judgment affirmed. Dillard, P.J. and Senior Judge C. Andrew Fuller concur.*